# EXHIBIT A1

COPY

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

MAY 24 2017

Sherri R. Carter, Executive Officer/Clerk

By Shaunya Bolden, Deputy

1  Carole E. Handler (SBN 129381)
   chandler@cdas.com
2  Brianna Dahlberg (SBN 280711)
   bdahlberg@cdas.com
3  COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP
   9595 Wilshire Boulevard, Suite 900
4  Beverly Hills, California 90212
   Telephone: (310) 492-4392
5  Facsimile: (212) 974-8474

6  Attorneys for Plaintiff
   Deborah M. Manchester, Ph. D.
7

8         SUPERIOR COURT OF THE STATE OF CALIFORNIA

9             FOR THE COUNTY OF LOS ANGELES

10 DEBORAH M. MANCHESTER, PH.D., an       Case No.
   individual;
11                                         BC 662610
12                                         COMPLAINT FOR:
            Plaintiff,
13                                         1.  BREACH OF CONTRACT
       v.
14                                         2.  MISAPPROPRIATION OF TRADE
                                               SECRETS (Civ. Code § 3426 *et seq.*)
15 SIVANTOS GMBH, a German company;
   SIVANTOS, INC., a Delaware corporation, and   3.  FRAUDULENT CONCEALMENT
16 DOES 1-10, inclusive;
                                           4.  UNJUST ENRICHMENT
17          Defendants.
                                           5.  VIOLATION OF BUS. & PROF.
18                                             CODE § 17200
19                                         6.  BREACH OF IMPLIED COVENANT
                                               OF GOOD FAITH AND FAIR
20                                             DEALING
21                                         DEMAND FOR JURY TRIAL
22
23
24
25
26
27
28

BY FAX

                        COMPLAINT

**Exhibit A-1**
**-7-**

1

**INTRODUCTION**

2    1.      This is an action for injunctive relief, damages, and disgorgement of profits arising

3  out of Defendants Sivantos GmbH and Sivantos, Inc.'s (collectively, "Defendants") theft of Plaintiff

4  Deborah M. Manchester's ("Plaintiff" or "Dr. Manchester") valuable patent-pending tele-audiology

5  technology, HARP.

6    2.      Innovation in the medical field depends on the skill of talented individual

7  professionals as much as on the contributions of large corporations. All too often, as has happened

8  here, powerful international conglomerates avail themselves of the creative inventions of talented

9  individuals, whose products might lead to competition in a given product market, without

10  acknowledgement or compensation. Plaintiff asks this Court to restrain and enjoin the wrongful

11  conduct that has occurred here.

12    3.      HARP is an innovative method which allows an audiologist or other hearing

13  professional to remotely access and make real-time adjustments to a patient's hearing aid via

14  Bluetooth through an application loaded on the patient's mobile device or computer, avoiding the

15  need for the patient to make office visits for fittings or routine adjustments. HARP also serves as a

16  communication tool affording communication between patient and hearing professional, through the

17  same remote connection, once the patient leaves the professional's office.  Communication between

18  patient and professional between the time the patient leaves the professional's office and before the

19  patient returns to the professional's office for the first check-up after a hearing aid fitting is often

20  critical to the success of the fitting of hearing aids and appropriate patient response to questions that

21  arise. The communication tool therefore serves as the heretofore missing link for that critical period

22  of time.

23    4.      In 2016, over the course of several months, Defendants engaged in discussions with

24  Dr. Manchester regarding a potential sale, license, or collaboration involving HARP. In these

25  discussions, Dr. Manchester disclosed highly confidential and proprietary information about HARP

26  to Defendants pursuant to a mutually and fully executed non-disclosure agreement. It was Dr.

27  Manchester's hope that she and Defendants could arrive at a licensing or purchase agreement. At the

28  time, Defendants expressly and affirmatively represented repeatedly that they were *not* already

1

**COMPLAINT**
**Exhibit A-1**
**-8-**

1   working on developing any similar technology and had no intention of so doing by themselves.

2   Defendants told both Dr. Manchester and her business associate that if they decided to pursue such

3   technology, including the use of Bluetooth, it would be in the distant future and would be done with

4   a consortium of hearing aid manufacturers.

5        5.        Significantly, Defendants expressed great enthusiasm for HARP and repeatedly asked

6   Dr. Manchester for detailed information about her technology, including information about how the

7   remote connection between applications is accomplished, and sought information about HARP's

8   Bluetooth and Apple iOS functionality.

9        6.        After several months of expressions of intense interest, however, and with no

10  explanation, Defendants abruptly cut off the discussions with Dr. Manchester on or about July 15,

11  2016. Despite the executed non-disclosure agreement, Defendants subsequently announced the

12  launch of their own application, Signia Telecare, which, contrary to their representations,

13  incorporates many of the novel proprietary features of HARP.

14       7.        As a direct and proximate result of Defendants' actions, Dr. Manchester has lost

15  several business opportunities to license and/or sell her HARP technology to third parties—including

16  the loss of the Sivantos relationship, as Defendants have instead incorporated key features Dr.

17  Manchester had developed in their blatant imitation. Until about July 15, 2016, relying on Sivantos'

18  expressions of interest which purported to recognize the uniqueness of Dr. Manchester's

19  contribution, Dr. Manchester had pursued the relationship with Defendants until discussions were

20  ended by Defendants.

21       8.        To date, Defendants have refused Dr. Manchester's repeated requests that they

22  provide her with credit and fair compensation for their unauthorized use of her technology and cease

23  and desist from its use. Defendants have left Dr. Manchester with no choice but to file this action to

24  enjoin the unlawful and continuing misappropriation of her work, depriving her of the recognition,

25  compensation, and credit her work deserves, and seek injunctive and other equitable relief.

26       9.        In their discussions with Dr. Manchester, Defendants' representatives have admitted

27  to Dr. Manchester and her representative that her invention had the potential for revolutionizing the

28  hearing aid industry from both a cost and patient convenience perspective. These precise health care

1  issues are the focus of intense current public debate and discussions. Not only has Dr. Manchester
2  been harmed by Defendants' copying—the harm affects the general public.

3  **PARTIES AND VENUE**

4       10.    Plaintiff Deborah M. Manchester is a citizen of California residing in Studio City,
5  Los Angeles, California 91604.

6       11.    Plaintiff is informed and believes, and based thereon alleges, that defendant Sivantos
7  GmbH is a company organized under the laws of Germany with its principal place of business at
8  Henri-Dunant Str. 100, 91058 Erlangen, Germany.

9       12.    Plaintiff is informed and believes, and based thereon alleges, that defendant Sivantos,
10  Inc. (formerly Siemens Hearing Instruments, Inc.) is a Delaware corporation with its principal place
11  of business located at 10 Constitutional Avenue, Piscataway, New Jersey, 08854.

12       13.    Upon information and belief, Defendant Sivantos, Inc. is the United States based
13  affiliate of Defendant Sivantos GmbH.

14       14.    Both Sivantos GmbH and Sivantos, Inc. are substantial businesses. Plaintiff is
15  informed and believes and thereon alleges that in the United States, Sivantos, Inc. has at least an
16  approximate 18% market share of the hearing instrument market. Defendants' parent company,
17  Sivantos Group, touts itself as "one of the world's leading manufacturers of hearing aids" and boasts
18  that it generated revenue of €933 million in the 2015-16 fiscal year.  Sivantos Group states on its
19  website that it "was spun off from 'Siemens Audiology Solutions' after Siemens AG sold the
20  company in 2015." https://www.sivantos.com/en/about-us/.

21       15.    This matter is properly filed in a court of unlimited jurisdiction because Dr.
22  Manchester's damages exceed $25,000.

23       16.    Venue is proper in this Court because Defendants' liability arose in the County of Los
24  Angeles, the defendants are doing business in the County of Los Angeles and are subject to the
25  jurisdiction of this Court, and the non-disclosure agreement alleged in Paragraph 33 (the "NDA")
26  was entered into in Los Angeles, California. Sivantos GmbH is a signatory to the NDA. Because this
27  action against Sivantos GmbH is an action for provisional relief, it is expressly allowed under Article
28  10 of the NDA.

**COMPLAINT**
**Exhibit A-1**
**-10-**

1    17.    Plaintiff is unaware of the true names and capacities, whether individual, corporate,

2    associate, agent, employee, or otherwise, of defendants Does 1 through 10, inclusive, and therefore

3    sues those defendants by such fictitious names. Plaintiff will seek leave to amend this Complaint to

4    allege such defendants' true names and capacities when such information has been ascertained.

5    18.    Plaintiff is informed and believes, and based thereon alleges, that in performing the

6    acts that give rise to this Complaint, each of the defendants named herein, including Does 1 through

7    10, was acting jointly with and under the direction of each of the other defendants, and with the

8    knowledge, authority, approval and ratification of, and as the agent for and on behalf of, each of the

9    other defendants.

10    **GENERAL ALLEGATIONS**

11    **A.    Background on Dr. Manchester's HARP Technology**

12    19.    Dr. Manchester is the sole inventor and exclusive owner of an innovative new tele-

13    audiology technology, HARP. Dr. Manchester has applied for both domestic and foreign patent

14    protection for HARP

15    20.    HARP allows an audiologist or other hearing professional to remotely access hearing

16    aids, which affords the opportunity to make real-time adjustments to a patent's hearing aid in the

17    patient's normal listening environment without the need for an office visit. The HARP technology

18    operates through an application on the patient's mobile device or computer, which is coupled to the

19    hearing professional's mobile device or computer. HARP allows the hearing professional to make

20    remote adjustments from virtually anywhere in the world, to anywhere in the world.  The hearing

21    professional can also measure real time sound pressure levels ("db SPL") from the patient's

22    environment, via a real-time feed of the patient's sound level audio reading which is streamed for

23    view on the hearing professional's device. This measurement has great value to the manufacturer for

24    future hearing aid development.

25    21.    HARP provides a robust and unique communication tool, allowing for text and voice

26    communication between the patient and hearing professional, to permit real-time adjustments no

27    matter where they are located.  Prior to HARP, hearing aid programming could only be done with

28    the hearing professional in an office with the patient.

4

**COMPLAINT**

**Exhibit A-1**

**-11-**

1     22.    HARP uses a Bluetooth low energy (BLE) programming standard that works with all

2 manufacturers' hearing aids that accept or incorporate Bluetooth technology, and allows the hearing

3 professional to make adjustments without the need for access to or use of any special manufacturer-

4 specific software or hardware.

5     23.    At a time when responsiveness to patient needs and the cost and availability of health

6 care are the focus of public attention, HARP offers a range of benefits for both patients and hearing

7 professionals that answer those concerns. By avoiding the need for the patient to visit the hearing

8 professional's office for fittings, and by permitting real-time adjustments in the patient's normal

9 listening environments, HARP saves patients time and money and solves common fitting and

10 acclimation issues that cause many patients to return their new hearing aids or decline to use them.

11     24.    In particular, HARP greatly benefits patients living in rural or remote areas, as well as

12 those who are institution bound or non-ambulatory, who would otherwise lack access to a hearing

13 professional. By allowing patients to be fitted remotely in their own homes, HARP has the potential

14 to revolutionize the hearing aid industry.

15     25.    HARP eliminates the main barrier to over-the-counter hearing aid sales, which is the

16 inability to program those hearing aids by a hearing professional. HARP allows for over-the-counter

17 sales with remote programming by hearing professionals. This feature alone opens the door to

18 increased global hearing aid sales and affords access to a $270 billion untapped market for over-the-

19 counter hearing aid sales.

20     26.    Prior to Dr. Manchester's invention of HARP, there was no similar telehealth

21 technology for hearing aids in the marketplace. There exist no duplicative patents or other "prior art"

22 on which Defendants could have relied that would in any way excuse Defendants'

23 misappropriations. Indeed, Defendants' representative acknowledged that Dr. Manchester's app was

24 revolutionary—yet they decline to credit her publicly.

25     27.    On September 6, 2015 Dr. Manchester filed a provisional patent application for her

26 HARP technology (App. No. 62/215,032).

27     28.    On May 18, 2016, Dr. Manchester filed a regular, non-provisional patent application

28 for her HARP technology (App. No. 15/158,667). This patent application is currently pending before

5

**COMPLAINT**

1 | the U.S. Patent and Trademark Office. The application has not yet been published.

2 |     29.    On April 6, 2017, Dr. Manchester filed an international patent application under the

3 | Patent Cooperation Treaty (PCT) designating all available countries and regional offices (App. No.

4 | PCT/US17/26381)

5 |     30.    Dr. Manchester is the sole inventor and sole owner of all patent applications.

6 |     31.    At all times, Dr. Manchester has taken diligent measures to protect her intellectual

7 | property and the confidentiality of information pertaining to the HARP technology.

8 |     **B.**    **Dr. Manchester Disclosed Her Trade Secrets to Defendants during Confidential**

9 |     **Licensing Discussions under a Non-Disclosure Agreement**

10 |     32.    In May of 2016, representatives of Defendants met Dr. Manchester at a trade

11 | conference in Phoenix, Arizona and expressed interest in a potential sale, license, or collaboration

12 | (the "Collaboration") involving HARP. This meeting was arranged and attended by Zachary Call, Sr

13 | Business Development Consultant for Sivantos, Inc., and two Sivantos team members including a

14 | technical expert. Also in attendance was Dave Larsen, a business associate of Dr. Manchester's.

15 |     33.    Before revealing any confidential or proprietary information, Dr. Manchester, Mr.

16 | Larsen, and Sivantos GmbH—the German parent company of the U.S.-based Sivantos, Inc.—

17 | entered into the NDA, under which Sivantos GmbH agreed that any confidential information

18 | provided by Dr. Manchester would be exclusively used for the purpose of engaging in discussions

19 | concerning a potential collaboration involving the technology, and not for any other purpose.  A

20 | copy of the NDA is attached hereto as **Exhibit A** hereto.

21 |     34.    The parties—all sophisticated business professionals—agreed and understood that

22 | Defendants could not use the information provided by Dr. Manchester for any purpose other than the

23 | Collaboration, including the creation of a similar product for Defendants' own exploitation.

24 |     35.    Relying upon the NDA and on the understanding between the parties it embodies, Dr.

25 | Manchester provided Defendants with a video demonstration of HARP. She also reviewed a power

26 | point presentation with Defendants' representatives which detailed the unique and novel features of

27 | the technology. In the belief that she was protected by the NDA, Dr. Manchester discussed these

28 | features at length with Defendants' representatives.

6

**COMPLAINT**
**Exhibit A-1**

**-13-**

1     36.     The reaction from Defendants was extremely positive. Over the next months

2    following the Phoenix conference, Dr. Manchester and her colleague Dave Larson had numerous

3    follow-up calls with high-level Sivantos representatives based both in the United States and in

4    Europe (including Frank Naumann, Nicolai Fisher, Thomas Fischer, and others) on which they

5    discussed the HARP technology in detail.

6     37.     On June 10, 2016, Frank Naumann emailed Dr. Manchester and Mr. Larsen that he

7    had presented the HARP video demonstration at a first R&D internal meeting and reported that

8    "[t]he colleagues were really impressed with what you did so far and your video demonstration . . .

9    I'll follow up with our Product and Portfolio Management Monday afternoon."

10     38.     On June 13, 2016, Mr. Naumann emailed Dr. Manchester and Mr. Larsen that he had

11    had a conversation with the Head of Strategic Portfolio Management of Sivantos GmbH, Nicolai

12    Fisher, regarding the HARP application and asked to schedule another conference call.

13     39.     That conference call, which included other senior Sivantos GmbH team members,

14    occurred on June 16, 2016. On the call, Sivantos GmbH's representatives expressly and

15    affirmatively told Dr. Manchester and Mr. Larsen that prior to meeting Dr. Manchester, Defendants

16    had *not* been working on developing any technology similar to HARP.

17     40.     Rather, Sivantos GmbH told Dr. Manchester and Mr. Larsen that if Defendants

18    pursued a Bluetooth solution to hearing aid programming, it would be in the distant future and

19    Defendants would not do so independently. Defendants told Dr. Manchester and Mr. Larsen that

20    they would *only* do so  with a consortium of hearing aid manufacturing peers to develop a different

21    type of remote access technology for hearing aids—a "group type" Bluetooth solution that would

22    require industry-wide agreement on a programming standard.

23     41.     Dr. Manchester and Mr. Larsen pointed out the advantages of acquiring HARP rather

24    than waiting for a future "group type" Bluetooth solution. For example, HARP's approach to

25    Bluetooth programming does not require an industry-wide agreement on a standard. The need for an

26    industry-wide agreement on a standard would likely cause substantial delay in bringing a product to

27    the marketplace, assuming that such an agreement could even be reached in the first place, and might

28    well invite legal challenges under United States antitrust laws.

**COMPLAINT**
**Exhibit A-1**
**-14-**

1    42.    In addition, while a group type solution would likely require a hearing professional

2    have access to special software and/or hardware specific to each manufacturer to make programming

3    changes, HARP allows for remote programming capabilities to *all* manufacturers' hearing aids

4    without special software or hardware.  All that is required is a Bluetooth connection.

5    43.    At no time on the June 16 call, or during any other communications with Dr.

6    Manchester or Mr. Larsen, did Defendants indicate or suggest that they were already working on a

7    technology similar to HARP. To the contrary, Defendants expressly represented that they were *not*

8    already working on a similar technology.

9    44.    Following the June 16 call, Defendants continued to express interest in a

10   collaboration involving HARP and sought more detailed technical information about how HARP

11   works from Dr. Manchester. Mr. Naumann emailed Dr. Manchester a list of technical questions

12   about the functionality of the HARP technology, and on June 27, 2016 Dr. Manchester responded

13   with a detailed Word document which included information about how HARP's remote connection

14   of the professional's and patient's applications is accomplished, as well as technical information

15   about HARP's Bluetooth low energy functionality and remote control functionality for Apple iOS.

16   45.    The parties had further communications in June and July, in which Sivantos GmbH

17   asked Dr. Manchester to send further materials, including the claims of her pending patent

18   application so that Sivantos GmbH could "see what they might be investing in."

19   46.    Just before Dr. Manchester sent the requested patent materials, however, Defendants

20   abruptly and without any explanation changed course. Their in-house lawyer, Frank Beck, wrote to

21   Dr. Manchester and Mr. Larsen and directed them *not* to send any further information under the

22   NDA:

23   ...at this point and until further notice we do not wish to accept any further

24   information under this Agreement, and should you disclose any Confidential

25   Information after the date of this notice, it would not be covered by the [Non-

26   Disclosure] Agreement.

27   A copy of Mr. Beck's email is attached as **Exhibit B** hereto.

28   47.    Following this notice, Sivantos GmbH cut off all communication with Dr.

1   Manchester.

2       48.     While these actions seemed strange to Dr. Manchester at the time—indeed, bizarre—

3   she received no explanation from Defendants. Their meaning has unfortunately been made clear by

4   subsequent events.

5              **C.**     **Defendants Misappropriated Dr. Manchester's Trade Secrets**

6       49.     Months later, Dr. Manchester learned from third parties that, contrary to their explicit

7   representations to Dr. Manchester, Defendants had launched their own remote programming hearing

8   aid application, Signia TeleCare ("TeleCare").

9       50.     It was apparent from Defendants' press and marketing materials that TeleCare

10  incorporated not only the remote programming functions and the text and voice communication tool

11  from HARP—precisely the features that Dr. Manchester had articulated in her presentations and

12  which were novel to her work—but also some of the exact language Dr. Manchester had used to

13  describe HARP's features in her presentation to Defendants. For example, Dr. Manchester had used

14  the phrase "the missing link" to describe the communication feature of HARP, and Defendants now

15  use the same phrase to describe the communication feature of TeleCare in their marketing materials.

16      51.     Notably, contrary to the representations of Defendants' representatives to Dr.

17  Manchester, TeleCare does *not* employ a "group type" Bluetooth solution that relies on an industry-

18  wide programming standard. Instead, it employs the same type of novel Bluetooth programming

19  solution employed by HARP.

20      52.     In addition, TeleCare uses the very same type of cloud server employed by HARP, in

21  the very same manner, which Dr. Manchester had described to Defendants' representatives.  At the

22  time Defendants were in discussions with Dr. Manchester regarding HARP, they represented to Dr.

23  Manchester that they were *not* using a cloud as part of their programming for any of their hearing

24  aids. Moreover, in their discussions with Dr. Manchester, Defendants' representatives were not even

25  aware that only one type of specific cloud could be used successfully to provide real-time remote

26  programming.

27      53.     After Defendants released TeleCare, numerous third parties, including the CEO of a

28  competing hearing aid manufacturer who was familiar with and interested in possibly acquiring

9

**COMPLAINT**

**Exhibit A-1**

**-16-**

1    HARP, contacted Dr. Manchester to congratulate her under the mistaken belief that TeleCare was an

2    authorized, licensed use of her HARP technology.

3         54.    These third parties' misimpressions have caused significant harm to Dr. Manchester

4    and her business. Prior to the release of TeleCare, another hearing aid manufacturer was negotiating

5    to buy Dr. Manchester's HARP technology, but public reports of TeleCare caused the manufacturer

6    to believe that Dr. Manchester had already sold her technology to Defendants and it called off the

7    discussions.

8         55.    Based on all of the foregoing, Dr. Manchester attempted for several months through

9    her counsel to try to resolve this dispute through appropriate attribution, compensation, or a future

10   business relationship, but Defendants have refused to provide her with any credit or compensation

11   for her contributions. Defendants' actions have left Dr. Manchester with no choice but to file this

12   litigation to enjoin this wrongful conduct.

13                                  **FIRST CLAIM**

14                              **Breach of Written Contract**

15                               **(Against Sivantos GmbH)**

16        56.    Dr. Manchester incorporates by reference Paragraphs 1 through 55 of this Complaint,

17   as though fully set forth herein.

18        57.    Dr. Manchester and Sivantos GmbH entered into the written NDA.

19        58.    Pursuant to the terms of the NDA, Sivantos GmbH agreed not to misuse or disclose

20   the confidential and proprietary information it obtained from Dr. Manchester thereunder.

21        59.    In direct violation of the NDA, Sivantos GmbH has misused, and continues to misuse,

22   the confidential and proprietary information provided thereunder for its own business purposes, to

23   develop, market, and sell its own TeleCare application, undercutting Dr. Manchester's own attempts

24   to license her HARP application to third parties.

25        60.    By virtue of the above actions, Sivantos GmbH has materially breached the NDA.

26        61.    At all relevant times, Dr. Manchester performed all obligations required of her under

27   the NDA, except for those excused by Sivantos GmbH's breaches of the NDA.

28        62.    As an actual, direct, and proximate result of Sivantos GmbH's breaches of the NDA,

1    Dr. Manchester has suffered and will continue to suffer substantial damages in an amount to be
2    ascertained at trial, but in excess of $50,000,000.

3        63.    Dr. Manchester has no speedy or adequate remedy at law as the harm to her is
4    continuing and irreparable. Unless restrained and enjoined by order of this Court, Sivantos GmbH
5    will continue to ignore and flout its obligations under the NDA.

6                                    **SECOND CLAIM**

7              **Misappropriation of Trade Secrets (Cal. Civ. Code § 3426 *et seq.*)**

8                              **(Against All Defendants)**

9        64.    Dr. Manchester incorporates by reference Paragraphs 1 through 63 of this Complaint,
10   as though fully set forth herein.

11       65.    Dr. Manchester has made reasonable efforts under the circumstances to preserve the
12   confidentiality of the above-described confidential information. Such information derives
13   independent economic value from not being generally known to the public or to other persons who
14   can obtain economic value from its disclosure or use. Accordingly, the above-described information
15   constitutes protectable trade secrets under California's Uniform Trade Secrets Act, Cal. Civ. Code §
16   3426 *et seq.*

17       66.    Defendants, including their current and former employees, were and are under a duty
18   both to keep Dr. Manchester's proprietary and confidential information secret, and not to use or
19   disclose such information other than for the benefit of Dr. Manchester and with Dr. Manchester's
20   authorization. Defendants knew or should have known that they had acquired such information
21   under circumstances giving rise to a duty to maintain its secrecy or limit its use, and/or derived from
22   or through a person who has such a duty and or through improper means.

23       67.    Nevertheless, Defendants took and disclosed the information to other persons, and
24   have used and are using the information, all without the express or implied consent of Dr.
25   Manchester.

26       68.    Defendants obtained the proprietary and confidential information described above
27   directly or indirectly from Dr. Manchester and not from generally available information or from
28   Defendants' own independent research and efforts.

1    69.    The Actions of Defendants constitute misappropriation of Dr. Manchester's trade

2  secrets under Cal. Civ. Code §3426 *et seq.*

3    70.    Each of the acts of misappropriation was done willfully and maliciously by

4  Defendants, thereby entitling Dr. Manchester to exemplary damages to be proved at trial pursuant to

5  Cal. Civ. Code §3426.3(c).

6    71.    As a direct and proximate cause of Defendants' misappropriation of Dr. Manchester's

7  trade secrets, Defendants have been unjustly enriched and Dr. Manchester has sustained damages in

8  an amount to be proven at trial.

9    72.    Dr. Manchester has suffered irreparable harm as a result of Defendants' activities and

10  will continue to suffer irreparable harm that cannot be adequately remedied at law.

11                                    **THIRD CLAIM**

12                              **Fraudulent Misrepresentation**

13                                **(Against All Defendants)**

14    73.    Dr. Manchester incorporates by reference Paragraphs 1 through 72 of this Complaint,

15  as though fully set forth herein

16    74.    As described above, Defendants, through their agents and employees, made false

17  statements to Dr. Manchester, including but not limited to representations that Defendants were not

18  working on a Bluetooth solution of their own apart from a "group type" solution, and that

19  Defendants were not independently working on any technologies similar to HARP at the time of

20  their discussions with Dr. Manchester.

21    75.    Upon information and belief, Defendants knew the statements were false at the time

22  the statements were made.

23    76.    Upon information and belief, Defendants intended that Dr. Manchester would rely on

24  the false statements in deciding whether to provide information about HARP to Defendants.

25    77.    Dr. Manchester did in fact rely on the false statements in providing information about

26  HARP to Defendants.

27    78.    As a direct and proximate result of Defendants' conduct, Dr. Manchester has been

28  damaged in an amount to be proven at trial, but not less than $50,000,000.

**FOURTH CLAIM**

**Unjust Enrichment**

**(Against All Defendants)**

79.     Dr. Manchester incorporates by reference Paragraphs 1 through 78 of this Complaint, as though fully set forth herein.

80.     As a result of Defendants' unfair and illegal actions, Dr. Manchester has been deprived of business opportunities to sell and/or license her HARP application.

81.     As a result of Defendants' unfair and illegal actions, Defendants have increased their profits in making and/or selling hearing aids.

82.     This unjust enrichment of Defendants at the expense of Dr. Manchester should be enjoined and the unlawful gain of Defendants should be disgorged.

**FIFTH CLAIM**

**Violation of California Business & Professions Code § 17200 *et seq.***

**(Against All Defendants)**

83.     Dr. Manchester incorporates by reference Paragraphs 1 through 82 of this Complaint, as though fully set forth herein.

84.     Defendant Sivantos, Inc., a substantial business in its own right which enjoys affiliation with other related companies, commands a substantial market share of the hearing instrument market in the United States geographic market. Defendant Sivantos GmbH and its parent company, Sivantos Group, similarly command substantial market share in the hearing instrument market.

85.     Defendants have acknowledged that an invention like Dr. Manchester' HARP app could restructure the relevant markets in which they exercise economic leadership, diminishing their competitive clout.

86.     Dr. Manchester is informed and believes and thereon alleges that Defendants recognized the potential competitive threat posed by Dr. Manchester's invention and acted, as described in this Complaint, to eliminate that competition.

87.     California Business Professions Code § 17200 prohibits "any unlawful, unfair or

13

COMPLAINT

1  fraudulent business act or practice." For the reasons described in this Complaint, Defendants have

2  engaged in unlawful, unfair and fraudulent business acts or practices in violation of California

3  Business and Professions Code § 17200.

4       88.    Dr. Manchester seeks an injunctive order of this Court directing Defendants to cease

5  and desist from the unlawful, unfair, and fraudulent conduct.

6  **SIXTH CLAIM**

7  **Breach of the Implied Covenant of Good Faith and Fair Dealing**

8  **(Against Sivantos GmbH)**

9       89.    Dr. Manchester incorporates by reference Paragraphs 1 through 88 of this Complaint,

10  as though fully set forth herein.

11       90.    Implied in the NDA was a covenant of good faith and fair dealing whereby Sivantos

12  GmbH impliedly covenanted that it would, in good faith and in the exercise of fair dealing, deal with

13  Dr. Manchester and others fairly and honestly, and do nothing to deprive Dr. Manchester of the

14  benefits of the agreement.

15       91.    Sivantos GmbH breached the covenant of good faith and fair dealing owed to Dr.

16  Manchester by, among other things, misusing Dr. Manchester's information provided to Sivantos for

17  its own purposes and/or disclosing the information to third parties, and deprived Dr. Manchester of

18  the benefit of the NDA.

19       92.    As an actual, direct, and proximate result of Sivantos GmbH's breaches alleged

20  herein, Dr. Manchester has suffered and will continue to suffer substantial damages in an amount to

21  be ascertained at trial but not less than $ 50,000,000.

22

23  **PRAYER FOR RELIEF**

24      Dr. Manchester prays for judgment as follows:

25  **First Claim**

26       1.    For general, special, and consequential damages in the amount of $50,000,000 or as

27  shown according to proof, together with interest as provided by law;

28       2.    That Sivantos GmbH, together with its officers, agents, employees and

14

**COMPLAINT**

1    representatives, and all persons acting in concert with them, be immediately and temporarily

2    restrained, preliminary enjoined during the pendency of this action, and permanently enjoined

3    thereafter from selling its TeleCare application or making any other unauthorized use or disclosure

4    of Dr. Manchester's trade secrets or proprietary information; and

5         3.    For disgorgement of profits and funds acquired by Sivantos GmbH as a result of its

6    breach of contract.

**Second Claim**

8         1.    For general, special, and consequential damages in the amount of $50,000,000 or as

9    shown according to proof, together with interest as provided by law;

10        2.    For exemplary damages in an appropriate amount or as shown according to proof

11   pursuant to Civ. Code § 3426.3(c);

12        3.    That Defendants, together with their officers, agents, employees and representatives,

13   and all persons acting in concert with them, be immediately and temporarily restrained, preliminary

14   enjoined during the pendency of this action, and permanently enjoined thereafter from selling their

15   TeleCare application or making any other unauthorized use or disclosure of Dr. Manchester's trade

16   secrets or proprietary information;

17        4.    For reasonable attorney's fees; and

18        5.    For disgorgement of profits and funds acquired by Defendants as a result of their

19   misappropriation of trade secrets.

**Third Claim**

21        1.    For general, special, and consequential damages in the amount of $50,000,000 or as

22   shown according to proof, together with interest as provided by law;

23        2.    For punitive damages in an appropriate amount or as shown according to proof; and

24        3.    For disgorgement of profits and funds acquired by Defendants as a result of their

25   fraudulent misrepresentations.

**Fourth Claim**

27        1.    For disgorgement of profits and funds acquired by Defendants as a result of their

28   misappropriation of Dr. Manchester's trade secrets and proprietary information; and

1  2.  That Defendants, together with their officers, agents, employees and representatives,

2 and all persons acting in concert with them, be immediately and temporarily restrained, preliminary

3 enjoined during the pendency of this action, and permanently enjoined thereafter from selling their

4 TeleCare application or making any other unauthorized use or disclosure of Dr. Manchester's trade

5 secrets or proprietary information.

6           **Fifth Claim**

7  1.  That Defendants be required to provide corrective advertising identifying Dr.

8 Manchester as the developer of the technology Defendants have wrongfully incorporated in their

9 TeleCare application; and

10  2.  That Defendants, together with their officers, agents, employees and representatives,

11 and all persons acting in concert with them, be immediately and temporarily restrained, preliminary

12 enjoined during the pendency of this action, and permanently enjoined thereafter from selling their

13 TeleCare application or making any other unauthorized use or disclosure of Dr. Manchester's trade

14 secrets or proprietary information.

15           **Sixth Claim**

16  1.  For general, special, and consequential damages in the amount of $50,000,000 or as

17 shown according to proof, together with interest as provided by law;

18  2.  That Sivantos GmbH, together with its officers, employees and

19  representatives, and all persons acting in concert with them, be immediately and temporarily

20 restrained, preliminary enjoined during the pendency of this action, and permanently enjoined

21 thereafter from selling its TeleCare application or making any other unauthorized use or disclosure

22 of Dr. Manchester's trade secrets or proprietary information; and

23  3.  For disgorgement of profits and funds acquired by Sivantos GmbH as a result of its

24 breach of contract.

25           **All Claims**

26  3.  That Dr. Manchester recover her costs of suit;

27  4.  For pre and prejudgment interest as allowed by law; and

28  5.  For such other and further relief as the Court deems just and proper.

**COMPLAINT**

**Exhibit A-1**

**-23-**

1

2    Dated:  May 23, 2017                          COWAN, DEBAETS, ABRAHAMS
                                                   & SHEPPARD LLP
3

4                                                  By: _____
                                                        Carole E. Handler
5                                                  Attorneys for Plaintiff
                                                   DEBORAH M. MANCHESTER, PH.D.
6

7

8

9

10                        **DEMAND FOR JURY TRIAL**

11           Plaintiff demands a trial by jury on all claims so triable.

12

13   Dated:  May 23, 2017                          COWAN, DEBAETS, ABRAHAMS
                                                   & SHEPPARD LLP
14

15                                                 By: _____
                                                        Carole E. Handler
16                                                 Attorneys for Plaintiff
                                                   DEBORAH M. MANCHESTER, PH.D.
17

18

19

20

21

22

23

24

25

26

27

28
                                       17
                                  **COMPLAINT**
                              **Exhibit A-1**
                                  **-24-**